IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs February 7, 2017

**LARRY MCNUTT v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
No. 11-02363        Glenn Ivy Wright, Judge
_____

**No. W2016-01086-CCA-R3-PC**
_____

Petitioner, Larry McNutt, appeals the post-conviction court's denial of relief from his convictions for reckless endangerment and aggravated assault. On appeal, Petitioner argues that he received ineffective assistance of counsel. After a thorough review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, P.J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, and J. ROSS DYER, JJ., joined.

Andrew S. Deshazo, Memphis, Tennessee (on appeal) and Warren Campbell, Memphis, Tennessee (at trial) for the appellant, Larry McNutt.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Charles Summers, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Background*

The facts of Petitioner's underlying offenses were set out by this court on direct appeal:

> At trial, the parties presented the following evidence: Jessie Lewis, the victim, testified that, at approximately 9:00 p.m. on October 29, 2010, he was "shooting craps" on "Dexter" near his home in Memphis, Tennessee. The victim recalled that he won between eight and ten

dollars that night. After collecting his winnings, the victim began his walk home.

The victim testified that, as he walked, the Defendant approached him, asking for money. The victim explained to the jury that he had known the Defendant "all [his] life." In response to the Defendant's request for money, the victim told the Defendant, "[N]o, I don't have it like that." The victim said the Defendant then cut the victim twice with a box cutter. After he was cut, the victim continued to his home where he called for an ambulance.

The victim testified that he spoke with the police at his home about the incident before emergency responders transported him to the hospital for medical treatment. He said that he received four stitches for the wound on his head and twenty stitches for the wound on his neck. The victim said that, several days later, he met with a police sergeant and once again recounted the encounter between him and the Defendant. The victim identified the Defendant in a photographic line-up for police. He also identified photographs of his scars taken at the police station.

On cross-examination, the victim agreed that he and the Defendant had engaged in a fight earlier in the day. The victim denied smoking crack with the Defendant on the day of this incident or attacking the Defendant with a baseball bat.

Tion Shabazz, a Memphis Police Department officer, testified that he responded to an assault call at approximately 9:30 p.m. on October 29, 2010. When Officer Shabazz arrived at the victim's residence, he observed a large cut on the victim's neck and another cut on his head. Officer Shabazz said that the victim did not appear to be under the influence of drugs or an intoxicant and that the victim communicated the events surrounding his injuries. Officer Shabazz recalled that the victim told him that the Defendant approached the victim and asked for two dollars. When the victim refused, the Defendant cut the victim with a box cutter.

Kimberly Hearn, a Memphis Police Department officer, testified that, while responding to a disturbance call on November 8, 2010, she was approached by the victim, who was not involved with the disturbance call. The victim told Officer Hearn that the Defendant, who was responsible for attacking him on October 29, was in the area. The victim showed Officer Hearn the scar on his neck and then pointed out the Defendant. Officer Hearn confirmed the information with the

supervising officer, Sergeant Kevin Williams, and then the Defendant was transported to the bureau.

Kevin Williams, a Memphis Police Department sergeant, testified that he participated in the investigation of an aggravated assault against the victim. Sergeant Williams said that he met with the victim, on November 5, 2010, approximately a week after the incident. He showed the victim a photographic line-up containing a picture of the Defendant, and the victim positively identified the Defendant as the perpetrator. Sergeant Williams recalled that the victim told him that the Defendant approached the victim after a dice game and asked for money. When the victim refused to give the Defendant money, the Defendant cut the victim with a box cutter. Sergeant Williams confirmed that he observed the injuries to the victim during their meeting a week after the incident.

Sergeant Williams testified about the Defendant's arrest in this matter. He said that Officer Hearn contacted him on November 8, 2010, about the victim's accusation that the Defendant had cut him with a box cutter. Sergeant Williams said that he instructed Officer Hearn to take the Defendant into custody and transport him to the "Robbery Office." Once there, Sergeant Williams advised the Defendant of his *Miranda* rights. The Defendant's statement, which was recorded in the form of officer's questions and the Defendant's responses, was then read into the record as follows:

> [Q.] Did you participate in the aggravated assault of [the victim] that occurred on October 29th, 2010[,] at approximately nine p.m.?
> A. Yes.
> Q. How do you know [the victim]?
> A. We grew up together.
> Q. Were you armed with a weapon? If so, describe it.
> A. It was a razor knife that I lay carpet with.
> Q. Describe in detail the events prior, during, and after the aggravated assault.
> A. Me, [the victim], and Phoebe were getting high on Hunter Street, so I had another little piece of dope left. [The victim] got mad because I would not give him any. Phoebe didn't say nothing. So [the victim] got mad, started calling me bitches and hoes. I sprung on [the victim] and I hit him with a razor. [The victim] went one way, then I went the other way.
> Two hours later I'm on Dexter, and him and two of his nephews jumped out the truck and come at me with a bat. When he came at

me with a bat, I hit him and knocked him down. I fell on top of him, then his nephew grabbed me from behind.

Q. Was [the victim] armed when you sliced him with a razor knife?
A. I didn't see nothing in his hands.
Q. Where did you slice [the victim] with the razor knife?
A. The left side of his face, above his eye.
Q. Did you slice [the victim] on the back of his beck [sic] with a razor knife?
A. No, I did not.

Sergeant Williams confirmed that the Defendant reviewed this statement and then added, "Two days later, [the victim] came and said he was sorry and to let it alone."

Reginald Partee testified on the Defendant's behalf. He stated that he witnessed the October 29, 2010 altercation involving the victim and the Defendant. Mr. Partee could not recall the exact time but stated that the incident occurred at night. He said that he and the Defendant were standing on Dexter when a red pick-up truck drove up. Mr. Partee said that two men were in the cab of the truck, and the victim was riding in the back of the truck. As soon as the truck stopped, the victim jumped out of the back of the truck carrying a baseball bat and walked toward the Defendant and Mr. Partee. He described what happened next as follows: "[The Defendant and victim] traded words, [the victim] aimed the bat like this going towards [the Defendant] and they tangled." At some point, the two men that were sitting in the cab of the truck, whom Mr. Partee recognized as the victim's nephews, broke up the fight between the Defendant and the victim. He said the victim's nephews told the victim to "get in the truck," and the three men left while the Defendant and Mr. Partee remained on Dexter.

On cross-examination, Mr. Partee agreed that the victim had "difficulty" walking due to arthritis but maintained that the victim "jumped" out of the back of the pick-up truck. Mr. Partee said that the Defendant "rushed" the victim as the victim approached "to protect himself." He said that the victim did not hit the Defendant because he did not "get a chance." Mr. Partee said that the victim's nephews intervened once the Defendant was on top of the victim. Mr. Partee said that he did not see "any blood" following this incident. He agreed that he was convicted three times of theft of property and twice of aggravated robbery. He stated that he had never told police about what he observed on the night of October 29, 2010.

Barry Borner testified that he observed an incident between the victim and Defendant that occurred between 9:00 p.m. and 10:00 p.m. on October 29, 2010. Mr. Borner said that he was in his yard when he saw the victim and the victim's nephew drive up in a truck. The victim got out of the back of the truck with a bat or stick and approached the Defendant. The Defendant charged the victim and knocked him to the ground. The two men "tussled for a minute" before the victim's nephew got out of the truck, retrieved the victim, and drove away.

On cross-examination, Mr. Borner said that he remembered the "scuffle" between the two men but that he could not remember the date of this incident. Mr. Borner said that he did not see the victim bleeding, although he had later heard that the victim "had been cut." He said that an ambulance was at the victim's house on the same night he witnessed the altercation. Mr. Borner agreed that he did not call police at the time of the incident and that, even after he was aware the Defendant had been arrested, he did not speak with police about the altercation he witnessed.

Phoebe James testified that she observed an incident between the victim and the Defendant that occurred on Hunter Street "while it was still light out," at around 5:30 or 6:00 p.m., on October 29, 2010. Ms. James said that she, the Defendant, and the victim had gotten "high together" and that the two men were gambling. The victim lost all of his money to the Defendant. The victim asked the Defendant for "a hit." The Defendant told the victim, he "didn't have enough," and then the Defendant and Ms. James started to walk away. The victim "said something crazy" and swung at the Defendant. The two men then began "tussling." Ms. James said this went on for two or three minutes before she broke up the two men. She said that the victim then walked away through "the pathway." She noticed "little droplets of blood," so she called out to the victim. When he turned around, she observed a "little cut on his head." She stated that she did not call the police about the incident because "[y]ou don't call no police about no little cat fight like that."

On cross-examination, Ms. James agreed that she had been smoking crack the night before and throughout the day of this incident. Ms. James said that she, the Defendant, and the victim had been "smoking so fast" that she could not estimate how much they had smoked that day. Ms. James said that she did not see a box cutter at any time during the incident she observed. Ms. James testified that she had "about twenty theft" convictions.

*State v. Larry McNutt*, No. W2012-02114-CCA-R3-C, 2014 WL 792148, at *1-4 (Tenn. Crim. App. Feb. 20, 2014).

*Post-Conviction Hearing*

At the post-conviction hearing, Petitioner testified that he and trial counsel discussed Petitioner's case in "small details," and he did not receive a discovery packet from trial counsel nor did they review discovery. Petitioner testified that he received a plea offer of ten years at forty-five percent release eligibility that in hindsight he wished he had accepted. He said that the victim did not want to pursue charges against him. However, trial counsel was not allowed to ask the victim that question at trial, and trial counsel did not file a motion in limine to determine the admissibility of the evidence. Trial counsel was also prohibited from asking the victim about his relationship with Petitioner. Petitioner testified that there was improper testimony at trial by a police officer who testified that Petitioner was under arrest before the offenses occurred, which Petitioner claimed was untrue.

Petitioner testified that trial counsel prepared a motion for new trial on Petitioner's behalf which included "three issues." He and trial counsel never discussed the motion nor the grounds that Petitioner wanted included. One of the issues that Petitioner wanted raised was the improper testimony by the police officer concerning Petitioner's arrest. He also wanted trial counsel to raise the issues of the trial court's exclusion of testimony from the victim regarding the victim's desire not to prosecute and testimony about Petitioner's relationship with the victim. The last issue that Petitioner wanted raised concerned the improperly admitted evidence about the background of one of the three defense witnesses. However, the issues that Petitioner wanted raised were not raised in the motion for new trial.

Petitioner testified that appellate counsel raised the issues that he had wanted raised in the motion for new trial in her brief on direct appeal. He said that the Court of Criminal Appeals reviewed the issues under the plain error since they had not originally been raised in the motion for new trial. Petitioner asserted that he would have had a better chance and that the outcome of his appeal would have been different if those issues had not been waived and then considered under plain error review.

On cross-examination, Petitioner testified that he rarely met with trial counsel, and trial counsel only wanted to discuss a plea offer. He said that trial counsel never told him what his "argument" would be. Petitioner provided trial counsel with the names of witnesses. He said that he told his side of the facts to trial counsel, and he told trial counsel that the victim wanted to talk to trial counsel about not testifying. Petitioner agreed that he and the victim got into an altercation after a dice game. The victim had abrasions and lacerations to his face and body. The State's theory was that the cuts were caused by a box cutter which was attested to by the victim at trial.

Petitioner testified that one of his witnesses, "Vebee" (Phoebe) James, admitted that she smoked crack with Petitioner. She also had twenty prior theft convictions which she testified to at trial. Petitioner testified that another of his witnesses, Reginald Partee, also had a lengthy criminal record, and he was questioned at trial about some of his convictions. Petitioner said that two of his three witnesses, Reginald Partee and Barry Barner, had similar testimony. He testified that trial counsel never informed him that the three defense witnesses might give conflicting testimony. Petitioner admitted that all of the issues that were discussed at the post-conviction hearing were considered on direct appeal by the Court of Criminal Appeals. However, upon questioning by the post-conviction court, Petitioner said that he was not aware that the issues were raised on appeal, which directly contradicted earlier testimony by Petitioner.

We note that trial counsel passed away prior to the post-conviction hearing. His case file was included as an exhibit at the post-conviction hearing. Trial counsel's notes reflected his tactics to impeach the victim, object to evidence, and argue that the State lacked due diligence. The file also contained the indictment, arrest report, affidavit of complaint, advice to witness viewing photographic display, the victim's statement and identification of Petitioner, Petitioner's statement to police and waiver of rights, photographs of the victim's injuries, the victim's medical records, jury instructions, jury information, trial counsel's personal notes from preliminary matters, voir dire, and the trial. Trial counsel's notes also reflected that he spoke with Petitioner concerning the offense and noted potential witnesses. His notes also established that he called Petitioner four times, leaving messages, before Petitioner returned his call.

*Analysis*

Petitioner contends that his trial counsel provided ineffective assistance because trial counsel failed to file a motion for new trial that included "*all grounds* that were to be considered on appeal[.]"

Post-conviction relief is available when a "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the [c]onstitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. The burden in a post-conviction proceeding is on the petitioner to prove his allegations of fact supporting his grounds for relief by clear and convincing evidence. T.C.A. § 40-30-110(f); *see Dellinger v. State*, 279 S.W.3d 282, 293-94 (Tenn. 2009). On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. *Fields v. State*, 40 S.W.3d 450, 456 (Tenn. 2001). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved" by the post-conviction court. *Id.* Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance

was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. *Id.* at 457.

Criminal defendants are constitutionally guaranteed the right to effective assistance of counsel. *Dellinger*, 279 S.W.3d at 293 (citing U.S. Const. amend. VI; *Cuyler v. Sullivan*, 446 U.S. 335, 344 (1980)). When a claim of ineffective assistance of counsel is made under the Sixth Amendment to the United States Constitution, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. *State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

Deficient performance requires a showing that "counsel's representation fell below an objective standard of reasonableness," despite the fact that reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 688-89. In reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. "Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. *Hellard v. State*, 629 S.W. 2d 4, 9 (Tenn. 1982).

Prejudice requires proof of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

"It has long been the rule in this state that in order to preserve errors for appeal, the appellant must first bring the alleged errors to the attention of the trial court in a motion for new trial." *Fahey v. Eldridge*, 46 S.W3d 138, 141 (Tenn. 2001); *see also* Tenn. R. App. P. 3(e) (requiring that issues be specifically raised in a timely motion for new trial in order to avoid waiver). In *James Frederick Hegel v. State*, No. E2013-01630-CCA-R3-PC, 2014 WL 2106703 (Tenn. Crim. App. May 19, 2014), this court stated:

Indeed, a defense counsel's complete failure to preserve and pursue available posttrial remedies can constitute performance so deficient that it becomes presumptively prejudicial. *See Wallace v. State*, 121 S.W.3d 652, 657 (Tenn. 2003) (presuming prejudice where counsel completely failed to file a motion for new trial, withdraw as counsel, or otherwise preserve the defendant's appellate remedies despite defendant's clear desire to pursue post-trial relief). However, like in the present case, where counsel files a motion for new trial but fails to raise certain issues, the defendant must prove "actual prejudice" in order to be entitled to relief. *See State v. Kenneth S. Griffin*, No. E2000-02471-CCA-R3-CD, 2001 WL 710178 (Tenn. Crim. App. June 25, 2001) (requiring proof of "actual prejudice" where counsel filed a motion for new trial but failed to include certain issues).

*Id*. at *9.

In this case, trial counsel filed a motion for new trial that included three issues: (1) the trial court's failure to grant a judgment of acquittal at the conclusion of the State's proof; (2) insufficient evidence as to the aggravated assault conviction; and (3) the trial court erred in its duty as 13th juror when it did not set aside the jury's verdict based upon the insufficiency of the evidence at trial. The motion did not include every issue that Petitioner thought should have been raised. However, Petitioner has not shown *actual prejudice* by trial counsel's failure to include the issues that he wanted raised in the motion for new trial. In his argument in his brief, Petitioner does not specify what issues trial counsel should have raised in the motion for new trial. He merely states, "it excluded from it every alleged error that pertained to [Petitioner's] particular case." Furthermore, Petitioner fails to state in his brief how the exclusion of any issue affected the outcome of his case. Therefore, as pointed out by the State, Petitioner has waived his issue concerning ineffective assistance of counsel because he does not cite to the record in support of his argument, and he failed to identify the issues that trial counsel failed to raise in the motion for new trial. *See* Tenn. R. Crim. P. 10(b). ( "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."); Tenn. R. App. P. 27(a)(7) (A brief shall contain "[a]n argument ... setting forth the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record... relied on."); *Michael Fields v. State*, No. E2015-01850-CCA-R3-PC, 2016 WL 5543259, at *9 (Tenn. Crim. App. Sept. 29, 2016).

Furthermore, a petitioner who argues that issues presented in the trial court should have been preserved for appellate review *must* at the very least convince the appellate court and the post-conviction court the omitted issues had merit. Obviously, the best way to show that is to present a legal argument for each issue. Not only did Petitioner fail to

do this in his brief, he asserts it is not necessary to do so because his case falls under the category of being "presumptively prejudicial." As noted above, when a timely motion for new trial is actually filed, and the issue is whether ineffective assistance was rendered by a failure to preserve certain issues on appeal, in order to be entitled to relief, a petitioner must prove *actual* prejudice. Petitioner has failed to do so, and he is thus not entitled to relief in this appeal.

## CONCLUSION

Based on the foregoing authorities and analysis, we affirm the judgment of the post-conviction court.

_____
THOMAS T. WOODALL, PRESIDING JUDGE